## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ANDREW MCNEILL,                          )
                                         )    Civil Action No.
        *Plaintiff,*                      )
                                         )    Filed Electronically
    vs.                                )
                                         )
MORTON'S OF CHICAGO/PITTSBURGH,          )
LLC d/b/a MORTON'S-THE STEAKHOUSE        )
                                         )
        *Defendant*.                     )
                                         )

## COMPLAINT IN CIVIL ACTION

Plaintiff, Andrew McNeill, by and through the undersigned counsel, files the following

Complaint in Civil Action against Defendant, Morton's of Chicago/Pittsburgh, LLC d/b/a

Morton's-The Steakhouse, and avers as follows:

## THE PARTIES

1.      Plaintiff, Andrew McNeill ("Plaintiff"), is an adult individual who resides in

Pittsburgh, Pennsylvania.

2.      Defendant, Morton's of Chicago/Pittsburgh, LLC d/b/a Morton's-The Steakhouse

("Morton's" or "Defendant"), is a foreign limited liability company with a registered address of

600 North Second Street, Suite 401. The Plaintiff reported to work on a regular basis at

Defendant's facility located at 625 Liberty Ave Suite 180, Pittsburgh, Pennsylvania 15222 (the

"Restaurant").

## JURISDICTION, VENUE, AND ADMINISTRATIVE EXHAUSTION

**A.      This Court Possesses Subject Matter Jurisdiction Pursuant to 28 U.S.C. § 1331 and
Supplemental Jurisdiction Pursuant to 28 U.S.C. § 1367.**

3.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §

1331 ("Federal Question Jurisdiction") as Plaintiff is advancing claims under Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") (Plaintiff's claims arising under Title VII is identified as the "Federal Law Claims").

**B.      The United States District Court for the Western District of Pennsylvania is the Appropriate Venue for this Matter Pursuant to 28 U.S.C. § 1391(b).**

4.      Venue is proper in the United States District Court for the Western District of Pennsylvania, Pittsburgh Division (hereinafter, the "Western District") as a substantial part of the events and omissions giving rise to the Federal Law Claims occurred within this judicial district. Therefore, venue is proper pursuant to 28 U.S.C. § 1391(b).

5.      Specifically, these events and omissions occurred within Allegheny County, Pennsylvania, which is one of the counties encompassed by the Western District.

6.      This matter is properly before the Pittsburgh Division of the Western District given the conduct complained of herein arose in Allegheny County, Pennsylvania, and conduct arising within Allegheny County is docketed within the Pittsburgh Division of the Western District Pursuant to LCvR 3.

**C.      This Court May Exercise Personal Jurisdiction Over Defendant.**

7.      This Court may exercise personal jurisdiction over Defendant pursuant to 42 Pa. C.S. § 5301(a)(2), and this Court's exercise of jurisdiction comports with the Due Process Clause of the United States Constitution.

8.      Personal jurisdiction is proper over a defendant if the defendant is a registered Pennsylvania entity and/or conducts continuous and systematic business within the Commonwealth and has thus "consented" to the exercise of general personal jurisdiction pursuant to 42 Pa. C.S. § 5301.

9.      42 Pa. C.S. § 5301 states: "The existence of any of the following relationships between a person and this Commonwealth shall constitute a sufficient basis of jurisdiction to

enable the tribunals of this Commonwealth to exercise general personal jurisdiction over such person."  42 Pa. C.S. § 5301(a). This definition is expanded to "corporations" and other entities pursuant to 42 Pa. C.S. § 5301(a)(2) which provides:

> Corporations.—
> (i) Incorporation under or qualification as a foreign corporation under the laws of this Commonwealth.
> (ii) Consent, to the extent authorized by the consent.
> (iii) The carrying on of a continuous and systematic part of its general business within this Commonwealth.

42 Pa. C.S. § 5301(a).

10.     As discussed above, Defendant is a limited liability company that maintains the Restaurant in Pennsylvania and conducts a continuous and systematic part of its general business operations within Pennsylvania. Accordingly, Defendant may properly be personally brought before this Court pursuant to 42 Pa. C.S. § 5301(a)(2)(iii).

**D.      Plaintiff Has Exhausted His Administrative Remedies; His Federal Law Claims are Properly Before This Court.**

11.     Plaintiff has satisfied all procedural and administrative prerequisites under 42 U.S.C. § 2000e-5 and may now proceed to bring this action before the Court. Specifically:

a.   On or about September 14, 2025, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC") seeking redress for the Federal Law Claim at charge number 533-2025-03379 (the "EEOC Charge").

b.   On September 15, 2025, the EEOC issued the Notice of Right to Sue ("RTS Notice"), affording Plaintiff 90 days within which to timely file the Federal Law Claims. This Complaint is filed within 90 days of Plaintiff's receipt of the RTS Notice. See **Exhibit A**, a true and correct copy of the RTS Notice.

3

**FACTUAL BACKGROUND**

12.     Plaintiff, Andrew McNeill, a 37-year-old African American and Native American male, initiated his employment with Defendant in or around September 2023.

13.     Plaintiff was hired in a full-time position as a "Server" at the Restaurant, earning an hourly wage of $2.85 plus gratuities.

14.     At the beginning of Plaintiff's tenure, the Restaurant was managed by Donovan Larkins ("Mr. Larkins"), and a positive and professional work culture existed.

15.     In or around May 2024, Mr. Larkins left his position and was replaced by Lisa Kalani ("Ms. Kalani").

16.     Upon Ms. Kalani's assumption of the manager role, the culture at the Restaurant abruptly changed to one of pervasive racism and race intolerance.

17.     This hostile culture was led by Ms. Kalani and heavily influenced by the Restaurant's Assistant Manager, Steven Ketchum ("Mr. Ketchum"), and the Restaurant's Supervisor, Miranda Wickens ("Ms. Wickens").

18.     Throughout his employment, Plaintiff was the only African American employee working in a customer-facing, "front of house" position.

19.     Upon information and belief, another African American employee, who worked as a "Host," experienced racially discriminatory treatment and was transferred to another location after threatening litigation against Defendant.

**Defendant's Discriminatory Treatment of Plaintiff**

20.     From approximately May 2024 through February 2025, Defendant, through its management, subjected Plaintiff to disparate treatment based on his race.

21.    For instance, approximately once or twice each week, Plaintiff would be "cut early" from his shifts due to purported "slow" business.

22.    Despite Plaintiff's seniority and performance, he was exclusively the person cut from his shift, while all other similarly situated Caucasian servers were permitted to continue working.

23.    On or about January 9, 2025, Plaintiff became ill with supraglottitis, which required hospitalization and prevented him from working until January 23, 2025.

24.    While other similarly situated Caucasian workers had previously missed similar amounts of time due to illness and were welcomed back to work without issue, Plaintiff was treated differently.

25.    Upon his return, Defendant required Plaintiff to produce a physician's verification and evaluation of his condition, a requirement that had never been imposed on a Caucasian employee under similar circumstances.

### Plaintiff Reports Discrimination and is Threatened

26.    Shortly after returning to work in late January 2025, Plaintiff had a conversation with a coworker, a "Cook" of mixed African American and Caucasian race.

27.    During this conversation, the Cook confided in Plaintiff that during management meetings, Plaintiff was repeatedly and disparagingly singled out and discussed. The Cook noted that no Caucasian employee was subjected to the same scrutiny.

28.    The Cook provided Plaintiff with Human Resources ("HR") contact information and encouraged him to report the racial discrimination he was experiencing.

29.    That same evening, Plaintiff contacted HR and reported his experiences of disparate and discriminatory treatment.

30.     On or about February 14, 2025, Plaintiff was summoned to a meeting with Defendant's Regional Manager, Jason "Jay" Stevens ("Mr. Stevens"), regarding his HR complaint.

31.     Rather than investigating Plaintiff's concerns or taking corrective action, Mr. Stevens dismissively stated, "We aren't racist. We don't roll like that."

32.     Mr. Stevens then followed his dismissal of Plaintiff's complaint with a veiled threat, stating, "But we can fire you for any reason," despite articulating no legitimate reason why Plaintiff's employment would be in jeopardy.

### Plaintiff Opposes Blatant Racism and is Targeted for Retaliation

33.     Later in February 2025, after Plaintiff had completed his shift and clocked out for the evening, a table of five African American women entered the Restaurant.

34.     Ms. Wickens approached Plaintiff as he was leaving and asked him to "clock back in" and take the table.

35.     Ms. Wickens explained that she was asking this "favor" of Plaintiff because none of the other servers on duty were willing to serve the patrons due to their race.

36.     Plaintiff was stunned and disgusted by the overtly racist premise of the request and refused to comply.

37.     Immediately following this incident, Plaintiff was clearly targeted, retaliated against, and set up by Defendant's management for termination.

38.     Specifically, Plaintiff began to receive a series of baseless and pretextual disciplinary write-ups.

39.     First, Plaintiff received a write-up for an alleged "failure to leave a wine cork on a customer's table." This was pretextual, as Plaintiff did not serve wine in his capacity as a server,

6

was not trained to do so, and had not served the wine at the table in question. Other employees who actually made this error were not disciplined.

40.     Second, Plaintiff received a write-up because a customer complained about unseasoned chicken. This was pretextual, as Plaintiff had no role in food preparation, and the customer's report explicitly noted that Plaintiff was "pleasant and professional." Other servers were not written up for similar food quality complaints.

41.     Third, Plaintiff received a write-up for serving brown lettuce. This was pretextual, as Plaintiff had alerted the prep cook to the quality of the lettuce prior to service, only to be told, "That's why we keep the lights dim." Ms. Wickens herself was present for this exchange and deemed the lettuce acceptable for service at that time.

### Pretextual Termination

42.     On or about May 3, 2025, Defendant terminated Plaintiff's employment.

43.     The purported reason for Plaintiff's termination was the series of pretextual write-ups he received directly after reporting discrimination and opposing his supervisor's request that he serve a table of patrons whom his coworkers refused to serve due to their race.

44.     Defendant's proffered reason for terminating Plaintiff's employment is a pretext for unlawful racial discrimination and retaliation.

### COUNT I
### RACIAL DISCRIMINATION IN VIOLATION OF TITLE VII
**(42 U.S.C. § 2000e, *et seq.*)**

45.     Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

46.     Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race.

47.     To establish a prima facie case of racial discrimination, a plaintiff must demonstrate that he: (1) is a member of a protected class; (2) was qualified for the position he held; (3) suffered an adverse employment action; and (4) the circumstances of the adverse action give rise to an inference of unlawful discrimination. *Grant v. Great Arrow Builders, LLC*, No. 2:20-cv-01856, 2023 U.S. Dist. LEXIS 58081, at *13 (W.D. Pa. Mar. 30, 2023).

**A.     Plaintiff is a Member of a Protected Class and Was Qualified for His Position.**

48.     Plaintiff is an African American and Native American man and is, therefore, a member of a protected class under Title VII.

49.     At all times material hereto, Plaintiff was qualified for his position as a Server.

50.     Plaintiff possessed the requisite skill, experience, and ability needed to perform the essential functions of his role and did so in a satisfactory manner from the commencement of his employment in September 2023 until the management change in May 2024.

51.     The pretextual nature of the disciplinary write-ups issued to Plaintiff—which were based on matters outside his control or job duties—further demonstrates that Plaintiff was qualified for his position and that Defendant's proffered reasons for its actions were false.

**B.     Plaintiff Suffered Adverse Employment Actions.**

52.     An "adverse employment action" is an action taken by an employer which is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Storey v. Burns Int'l Servs.*, 390 F.3d 760, 764 (3d Cir. 2004).

53.     Plaintiff was subjected to numerous adverse employment actions by Defendant.

8

54.    Specifically, Defendant, through its management, regularly "cut" Plaintiff from his shifts early, which directly reduced his compensation in the form of lost wages and gratuities, while similarly situated Caucasian employees were not cut.

55.    Defendant subjected Plaintiff to different terms and conditions of employment when it required him to produce a physician's verification following an illness, a requirement not imposed on similarly situated Caucasian employees.

56.    Defendant subjected Plaintiff to a pattern of disparate treatment and baseless disciplinary actions, including issuing pretextual written warnings for conduct he did not engage in or for which he was not responsible.

57.    As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff suffered the ultimate adverse employment action when his employment was terminated on May 3, 2025.

**C.    The Adverse Actions Occurred Under Circumstances Giving Rise to an Inference of Unlawful Discrimination.**

58.    Defendant's adverse actions against Plaintiff occurred under circumstances that give rise to a clear inference of unlawful racial discrimination.

59.    Plaintiff was the only African American employee in a "front of house" position and was treated less favorably than his similarly situated Caucasian colleagues.

60.    Defendant's management, including Ms. Kalani, Mr. Ketchum, and Ms. Wickens, fostered and promoted a culture of racism and subjected Plaintiff to disparate treatment, including singling him out for criticism in management meetings.

61.    After Plaintiff reported this discriminatory conduct to HR, Defendant's Regional Manager, Mr. Stevens, dismissed the complaint and threatened Plaintiff's employment.

9

62. The inference of discrimination is overwhelmingly supported by Ms. Wickens' request that Plaintiff serve a table of African American patrons specifically because other Caucasian servers refused to do so due to the patrons' race.

63. Defendant's proffered reasons for terminating Plaintiff—the series of baseless write-ups—were a transparent pretext for racial discrimination. The write-ups immediately followed Plaintiff's opposition to Ms. Wickens' racially discriminatory request and his earlier complaint to HR, demonstrating a clear link between his protected status and the adverse actions.

**D.     Plaintiff is Entitled to Punitive Damages.**

64. A plaintiff may recover punitive damages when he can demonstrate a defendant "engaged in discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).

65. The terms "malice" and "reckless indifference" pertain specifically to the defendant's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination. *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999).

66. At all times relevant herein, Defendant, through its managers and supervisors, acted with malice and/or reckless indifference to Plaintiff's federally protected rights.

67. Defendant had actual knowledge of the pervasive racial discrimination and hostility, as Plaintiff reported it to HR.

68. Rather than take corrective action, Defendant's Regional Manager acknowledged awareness of its obligations by stating "We aren't racist" before immediately threatening Plaintiff for reporting the conduct.

69.     Furthermore, Ms. Wickens' request that Plaintiff serve patrons whom other employees refused to serve based on their race demonstrates a conscious and reckless disregard for the prohibitions against racial discrimination under federal law.

70.     Defendant's decision to then terminate Plaintiff on pretextual grounds after he opposed this conduct constitutes a malicious and reckless violation of his rights.

71.     As a direct and proximate result of Defendant's discriminatory conduct in violation of Title VII, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses he suffered and will continue to suffer.

WHEREFORE, Plaintiff, Andrew McNeill, seeks a judgment against Defendant, Morton's of Chicago/Pittsburgh, LLC d/b/a Morton's-The Steakhouse, for willful noncompliance with Title VII and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life; (ii) punitive damages in an amount to be determined at trial and in an amount sufficient to deter Defendant from engaging in future conduct of a similar nature; (iii) equitable relief in the forms of back pay and front pay; (iv) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; (v) pre-judgment and continuing interest; and (vi) such other and further relief as this Court deems just and proper.

11

## COUNT II
## RETALIATION IN VIOLATION OF TITLE VII
### (42 U.S.C. § 2000e, *et seq.*)

72.     Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

73.     Title VII makes it unlawful for an employer to discriminate against any of its employees for opposing any practice made an unlawful employment practice by these statutes, or for making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under these statutes.

74.     To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) he engaged in a protected activity; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action.  *Kengerski v. Allegheny Cty.*, 435 F. Supp. 3d 671, 676 (W.D. Pa. 2020).

**A.     Plaintiff Engaged in Protected Activities.**

79.     Plaintiff engaged in legally protected activities on at least two separate occasions.

80.     First, in late January 2025, Plaintiff engaged in a protected "participatory" activity when he contacted Defendant's HR department to report the ongoing racial discrimination and disparate treatment he was experiencing at the hands of Defendant's management.

81.     Second, in late February 2025, Plaintiff engaged in a protected "oppositional" activity when he refused his supervisor, Ms. Wickens', request to serve a table of African American patrons.

82.     Ms. Wickens explicitly stated that the request was being made because other Caucasian servers refused to serve the patrons due to their race.

83.     By refusing to comply with and thereby facilitate a blatantly discriminatory act, Plaintiff was opposing a practice made unlawful by Title VII.

**B.     Plaintiff Suffered Adverse Employment Actions.**

84.     Following his engagement in protected activities, Defendant subjected Plaintiff to a series of materially adverse employment actions.

85.     An adverse employment action in the context of a retaliation claim is one that is serious and tangible enough to dissuade a reasonable worker from making or supporting a charge of discrimination. *Faulk v. Borough*, Civil Action No. 19-883, 2021 U.S. Dist. LEXIS 54281, at *3 (W.D. Pa. Mar. 23, 2021).

86.     Defendant's Regional Manager, Mr. Stevens, subjected Plaintiff to an adverse action on February 14, 2025, when he responded to Plaintiff's HR complaint not with corrective action, but with a threat of termination, stating, "we can fire you for any reason."

87.     Subsequently, Defendant subjected Plaintiff to further adverse actions by issuing him a series of baseless and pretextual disciplinary write-ups for matters outside of his control or responsibility.

88.     Ultimately, as a culmination of its retaliatory animus, Defendant subjected Plaintiff to the ultimate adverse employment action when it terminated his employment on May 3, 2025.

**C.     A Causal Connection Exists Between Plaintiff's Protected Activities and the Adverse Actions.**

89.     A clear causal connection exists between Plaintiff's protected activities and the adverse employment actions he suffered.

90.     Causation can be established by, among other things, a close temporal proximity between the protected activity and the adverse action, or by evidence of a pattern of antagonism

following the protected conduct. *Cooper v. Fayette Cty.*, No. 2:24-CV-01213-MJH, 2025 U.S. Dist. LEXIS 200959, at *10 (W.D. Pa. Oct. 10, 2025).

91.    Here, the temporal proximity is unusually suggestive of a retaliatory motive. Mr. Stevens threatened Plaintiff's job during the very meeting convened to discuss his HR complaint.

92.    Furthermore, the pattern of antagonism began immediately after Plaintiff's oppositional activity in late February 2025. Prior to his complaints and opposition, Plaintiff had a clean disciplinary record. Immediately after, he was targeted with a sudden barrage of three pretextual written warnings.

93.    The pretextual nature of these warnings is further evidence of Defendant's retaliatory motive. The write-ups concerned a wine cork when Plaintiff did not serve wine, bland chicken which Plaintiff did not prepare, and brown lettuce which his supervisor had expressly approved for service.

94.    Defendant's proffered reasons for terminating Plaintiff were a transparent pretext for unlawful retaliation, designed to punish Plaintiff for reporting racial discrimination and for refusing to participate in it.

**D.    Defendant's Actions Were Malicious and in Reckless Indifference to Plaintiff's Rights.**

95.    At all times relevant herein, Defendant, through its managers and supervisors, acted with malice and/or with reckless indifference to Plaintiff's federally protected right to be free from retaliation.

96.    Defendant had actual knowledge of its legal obligations yet consciously disregarded them. Plaintiff put Defendant on direct notice of the ongoing discrimination through his report to HR.

97.    Rather than investigate and remedy the unlawful conduct, Defendant's management chose to retaliate. Mr. Stevens, a regional manager, threatened Plaintiff for engaging in protected activity. Ms. Wickens, a supervisor, punished Plaintiff for opposing an unlawful practice.

98.    Defendant then engaged in a coordinated effort to create a false paper trail to justify Plaintiff's termination, demonstrating that its actions were not merely negligent, but intentional, malicious, and in reckless disregard of the law.

99.    As a direct and proximate result of Defendant's retaliatory conduct in violation of Title VII, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses he suffered and will continue to suffer.

WHEREFORE, Plaintiff, Andrew McNeill, seeks a judgment against Defendant, Morton's of Chicago/Pittsburgh, LLC d/b/a Morton's-The Steakhouse, for willful noncompliance with Title VII and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life; (ii) punitive damages in an amount to be determined at trial and in an amount sufficient to deter Defendant from engaging in future conduct of a similar nature; (iii) equitable relief in the forms of back pay and front pay; (iv) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; (v) pre-judgment and continuing interest; and (vi) such other and further relief as this Court deems just and proper.

## JURY DEMAND

100.    Plaintiff requests a trial by jury on all matters so triable.


Date: December 12, 2025                    Respectfully submitted,

                                           **THE WORKERS' RIGHTS LAW GROUP, LLP**
                                           By: */s/ Brendan K. Petrick*
                                               Brendan K. Petrick, Esq. (Pa. I.D. No. 88968)
                                               */s/Patrick W. Carothers*
                                               Patrick W. Carothers, Esq. (Pa. I.D. No. 85721)
                                               */s/ Garret A. Hampton*
                                               Garret A. Hampton, Esq. (Pa. I.D. No. 338635)

                                               The Workers' Rights Law Group, LLP
                                               Foster Plaza 10
                                               680 Andersen Drive, Suite 230
                                               Pittsburgh, PA 15220
                                               Telephone: 412.910.9592
                                               Facsimile: 412.910.7510
                                               brendan@workersrightslawgroup.com
                                               patrick@workersrightslawgroup.com
                                               garret@workersrightslawgroup.com

                                               *Counsel for Plaintiff, Andrew McNeill*

16